UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
PETER ORLANDI,                                  :    __ Civ. __
                                                :    (ECF)
                Plaintiff,                      :
                                                :    **COMPLAINT**
        -against-                               :
                                                :    JURY TRIAL DEMANDED
CITIBANK, N.A.,                                 :
                                                :
                Defendant.                      :
------------------------------------------------------------------ X

Plaintiff, Peter Orlandi ("Orlandi"), by his attorneys, Liddle & Robinson, L.L.P., for his Complaint alleges as follows:

## THE NATURE OF THE ACTION

1.  Plaintiff brings this action against Defendant Citibank N.A. ("Citibank" or "Defendant") for violations of the Sarbanes-Oxley Act (18 U.S.C. § 1514A Section 806 et seq.) and violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. § 78u-6, Section 922(h)) ("Dodd Frank").

## THE PARTIES

2.  Defendant employed Orlandi from January 1996 to the time of the termination of his employment on October 7, 2011. At the time his employment ended, Orlandi was serving as a Senior Vice President of Treasury Derivative Accounting, and worked in

Citibank's Long Island City offices located at 1 Court Square, Long Island City, New York (Queens). Orlandi resides at 325 N. Union Avenue, Cranford, New Jersey, 07016.

3. Defendant Citibank is a company within the meaning of 18 U.S.C. § 1514A. Citibank transacts business within the state of New York. Its principal place of business is New York, New York.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction over both Plaintiff's Sarbanes-Oxley and Dodd-Frank claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78u-6(h)(1)(B)(i).

5. Plaintiff has exhausted the administrative remedies available to him under Sarbanes-Oxley in that, on or about January 13, 2012, he filed a Sarbanes-Oxley Complaint with the United States Department of Labor in accordance with 18 U.S.C. § 1514A(b)(1)(B). The Secretary of Labor has not issued a final decision within 180 days of that filing.

## VENUE

6. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Eastern District of New York.

## FACTS

7. Orlandi began his employment with Defendant in 1996.

8. In his position as Senior Vice President in Treasury Derivatives Accounting, Orlandi managed a staff of fourteen (hereinafter referred to as "Orlandi's group"). His responsibilities included, among other things: (1) managing the accounting and conducting the analysis of hedging and trading activities transacted on multiple books and over several legal entities, (2) analyzing portfolios to identify the factors that drove earnings, (3) providing analytical information to traders, and (4) implementing and following the accounting and reporting requirements for SFAS 133 accounting for derivatives.

9. In 2011, Orlandi reported directly to Joe Desmond ("Desmond"), Director of Treasury Accounting.

10. Throughout his employment, Orlandi performed his duties and responsibilities with Defendant in a professional manner, as reflected by, among other things, his performance reviews and the consistent increases in his compensation.

11. In March 2006, a Citibank employee named Gary Foster ("Foster") transferred into Orlandi's Derivatives Accounting Group as an Assistant Vice President.

12. At the time Foster joined the Derivatives Accounting Group, Orlandi's supervisor Helga Oser and Foster's prior manager, Neal Ducorsky, advised Orlandi that Foster:

3

(a) had been a Citibank employee since 2000, (b) was highly rated, and (c) was considered by his previous managers to be an outstanding employee.

13. In September 2006, Foster began reporting to Joe Tredici ("Tredici"), a Vice President who managed the debt related hedges within Derivatives Accounting. Tredici reported to Orlandi. When Tredici resigned from Citibank in February 2010, he recommended that Foster fill his position.

14. Based on Tredici's recommendations and other positive recommendations Orlandi received about Foster, Foster was appointed to assume Tredici's position, which included managing debt related hedges within Derivatives Accounting and responsibility for a staff of employees.

15. Foster reported directly to Orlandi for eleven months, from February 2010, until Foster's voluntary resignation from Citibank, in January 2011.

16. On or about June 15, 2011 – approximately six months after Foster resigned his employment with Citibank – a representative in Citibank's Operations Department located in South Dakota emailed Orlandi and requested that he review a report listing two-and-one-half-years of outgoing cash wires to determine if any were "procure 2 pay" expenditures (e.g. expenditures for items such as lodgings, meals, and computers), and if so, that they complied with certain TARP related obligations concerning "procure 2 pay" expenditures.

17.	In reviewing the report, Orlandi discovered certain unusual expenditures unrelated to the "procure 2 pay" issue that he had been asked to review. There were nine wire transfers listed within the report, totaling $15.3 million, dated between July 2010 and December 2010. Each of the nine transactions contained an explanation of the expenditure and the same odd comment: "Contact Gary Foster."

18.	The nine wire transfers were unusual in other ways as well. First, the identified account number of each of the nine wire transfers was the same JP Morgan Chase account. Second, the account number was twelve digits; generally a large number of digits is indicative of a personal account as opposed to a business account. Third, all of the amounts that had been wired out ended in round numbers.

19.	Orlandi further investigated these peculiar wire transfers.

20.	Orlandi contacted Angela Matina, Vice President of Treasury Derivatives Accounting ("Matina") and Orlandi's direct report. He asked her to find the payments in Summit, which is Citibank's Treasury computerized operating system, in which all derivative transactions are recorded. Matina could not locate any of the wire transfers within Citibank's Summit system.

21.	On the following day, June 16, 2010, Orlandi asked his Citibank staff members to attempt to locate supporting documentation to verify the nine wire transfers. Orlandi's staff was unable to do so.

5

22. On June 17, 2011, Orlandi contacted Martin Danowitz ("Danowitz"), a representative at JP Morgan Chase, to see if he could provide Orlandi with additional information with regard to the account where the wires were transferred. Danowitz advised Orlandi that it was a personal account, and therefore he could not disclose any additional information.

23. As a result of these findings, Orlandi notified his supervisor, Desmond, that he believed Foster had engaged in fraudulent conduct.

24. Desmond immediately reported Orlandi's findings to his direct supervisor, Srinivasan Vaidyanathan ("Vaidyanathan"), and Geoffrey Obici ("Obici"), a Vice President in Citibank's Security Department.

25. Upon Orlandi and Desmond notifying the Citibank Security Department of Foster's suspected fraudulent conduct, Citibank began, on or about June 23, 2011, a full-scale investigation of Foster (the "Investigation") and his conduct as a Citibank employee. Citibank subsequently notified the FBI and the FDIC of the Investigation and Foster's suspected criminal misconduct.

26. Orlandi played an integral role in assisting Citibank, the FBI and the FDIC throughout the Investigation into Foster's fraudulent conduct.

27. Orlandi worked many long hours on the Investigation, and met with federal government officials, including representatives from the FBI and FDIC. Through these

6

efforts, it was discovered that Foster engaged in conduct over at least an eight-year period of time of knowingly falsifying records in support of a scheme to embezzle funds from Citibank.

28.     The Investigation uncovered that Foster entered, or instructed others to enter on his behalf, requests into Citibank's Sungard system to transfer funds from a Citibank account to his personal account. Based on these fraudulent entries, Citibank SD (South Dakota) wired the funds to Foster's account, resulting in the reduction of Citibank assets. Upon information and belief, Foster recorded or instructed others to record manual accounting entries into Citibank's Summit system, which would then post to Citibank's general ledger. The inaccurate reporting of Citibank cash, interest expense, debt adjustment expense, and amortization expense accounts, caused inaccurate reporting of such accounts on Citibank's financial statements.

29.     The Investigation also uncovered that on eight different occasions in 2007, 2008 and 2009, Foster sent fraudulent faxes to Citibank's wire department in Baltimore, Maryland requesting that funds be sent from Citibank accounts to his personal account. The Baltimore office was responsible for verifying the faxes prior to wiring the funds to the designated account. The Baltimore office failed to do so, and wired the funds to Foster's personal account for each of the eight faxed requests. Citibank's financial statements reflected inaccurate entries in its general ledger in connection with these fraudulent transfers.

30.     The Investigation also uncovered that on thirty-nine different occasions from 2003 to 2007, Foster engaged in fraudulent transfers to his personal accounts. Upon information and belief, Forster entered or instructed others to enter into the cash transfer system

fraudulent requests for funds to be sent to his personal account, for each of the thirty-nine requests. Citibank's financial statements reflected inaccurate entries in its general ledger in connection with these fraudulent transfers.

31. In the Investigation, Orlandi was not accused of failing to properly comply with existing supervisory controls in effect in his role as Foster's manager, nor was he found to have failed to do so.

32. With Orlandi's assistance, the Investigation determined that Foster's fraudulent conduct, over at least an eight-year period, resulted in Foster embezzling approximately $23 million in Citibank funds, and wiring those funds to his own personal JP Morgan Chase account.

33. On June 23, 2011, the Attorney General of the United States, through the United States Attorneys' Office for the Eastern District of New York, arrested Foster and charged him with bank fraud.

34. On September 6, 2011, Foster appeared before the Honorable Eric N. Vitaliano of the United States District Court for the Eastern District of New York and pled guilty to one count of bank fraud.

35. At the plea hearing before Judge Vitaliano on September 6, 2011, Foster admitted that between 2003 and 2010, while employed by Defendant, he executed a scheme to defraud the bank by drafting emails and/or faxes directing that bank funds which belonged to the

bank be wired into his personal account at JP Morgan Chase. He further admitted that he made entries in bank records designed to conceal the fact that he took these funds.

36. In connection with the uncovering of Foster's fraudulent conduct, Citibank has recovered over $14 million of the embezzled funds.

37. On October 4, 2011, less than one month after Foster pled guilty to embezzlement, Orlandi was asked to report to Citibank's offices at 601 Lexington Avenue in Manhattan at 3:00 p.m.

38. Present at the meeting was Vaidyanathan and Charmaine Milano, a Human Resources representative. Vaidyanathan told Orlandi that his employment was terminated due to a lack of leadership regarding the Gary Foster situation. Milano informed Orlandi that his last day on Citibank premises would be three days later.

**FIRST CLAIM**
(Violation of Whistleblower Protection
Under Sarbanes-Oxley, 15 U.S.C. § 1514A)

39. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 38 as if separately set forth herein.

40. Citibank is a company within the meaning of 18 U.S.C. § 1514A.

9

41. Orlandi was an "employee" of Citibank protected by Sarbanes-Oxley, 18 U.S.C. § 1514A(a).

42. Orlandi engaged in activity that was protected by Sarbanes Oxley by among other things, informing his Citibank supervisors, including Desmond, Vaidyanathan, and Obici, and federal law enforcement officials, about conduct that he reasonably believed violated various provisions of federal law relating to fraud, including wire fraud, bank fraud, and securities fraud and by participating in the Investigation of Foster. Orlandi reported his concerns to persons with supervisory authority over him, and to other such persons working for or on behalf of his employer and federal law enforcement officials.

43. Orlandi's employment was terminated on October 7, 2011, approximately one month after the investigation and prosecution of Foster concluded in connection with Orlandi's alleged lack of leadership regarding the Foster situation.

44. Orlandi's protected activity was a contributing factor in Citibank's adverse employment action against him, which constituted discrimination against Orlandi in violation of Sarbanes-Oxley, 18 U.S.C. § 1514A.

45. As a result of Citibank's conduct, Orlandi has suffered, and will continue to suffer substantial damages, including but not limited to lost wages and benefits in the form of back pay, reinstatement or front pay in lieu of reinstatement, interest, attorneys' fees, interest and costs, and special damages, all in amounts to be determined at trial.

## SECOND CLAIM
(Violation of Whistleblower Protection Under Dodd-Frank)

46. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 as if separately set forth herein.

47. Orlandi engaged in protected activity as a whistleblower within the meaning of Dodd Frank because he made disclosures that were required and protected by Sarbanes Oxley, the Securities Exchange Act of 1934 and other laws, rules and regulations subject to the jurisdiction of the SEC.

48. Orlandi made these protected disclosures to his Citibank supervisors, including Desmond, Vaidyanathan, and Obici, and to federal law enforcement officers.

49. Orlandi's disclosure of Foster's fraudulent conduct related to violations of the securities laws, including but not limited to Section 13(b)(2) and (5) of the Securities Exchange Act of 1934, which require the maintenance of accurate books and records by Citibank in connection with transactions and contain prohibitions against any person such as Foster knowingly circumventing these obligations.

50. Orlandi possessed a reasonable belief that violations of these laws, rules and regulations were occurring, and in fact did occur, when he discovered and disclosed Foster's fraudulent recording of books and records, transmittal of fraudulent records through the use of

11

the wire services all in support of Foster's embezzlement of funds from Citibank into his own personal accounts.

51. Citibank violated 15 U.S.C. § 78u-6 because the disclosures required of Orlandi under Sarbanes-Oxley was a contributing factor in the bank's decision to terminate Orlandi's employment.

52. Citibank violated Dodd Frank by terminating Orlandi's employment on or around October 4, 2011 in connection with Orlandi's alleged lack of leadership regarding Foster.

53. As a result of Citibank's conduct, Orlandi has suffered substantial damages and is entitled to relief in the form of two times the amount of back pay otherwise owed, reinstatement or front pay in lieu or reinstatement, plus attorneys' fees, interest and costs.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A. For violations of Sarbanes-Oxley, damages including back pay, reinstatement or front pay in lieu of reinstatement, special damages, pre-judgment interest, attorneys' fees and costs, in amounts to be determined at trial;

B. For violations of Dodd Frank, double back pay with interest, reinstatement or front pay in lieu of reinstatement, attorneys' fees and costs, in amounts to be determined at trial;

C.     Such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           December 10, 2012

                                        LIDDLE & ROBINSON, L.L.P.

                                        By: _____
                                            Marc A. Susswein
                                            David I. Greenberger
                                        800 Third Avenue, 8th Floor
                                        New York, New York 10022
                                        Telephone: (212) 687-8500
                                        msusswein@liddlerobinson.com
                                        dgreenberger@liddlerobinson.com

                                        *Attorneys for Plaintiff*